**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**George Allen MEBANE; Leon Ralph Sears; Orville Larry Woodhouse; Nathan Cartwright, Jr., Defendants–Appellants.**

**No. 87–5581.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 30, 1987.

Decided Feb. 22, 1988.

Hugh Stevens (Abraham Penn Jones, Adams, McCullough & Beard, Raleigh, N.C., on brief), for defendants-appellants.

Rocco Joseph deGrasse, Asst. U.S. Atty. (J. Douglas McCullough, Acting U.S. Atty., Raleigh, N.C., on brief), for plaintiff-appellee.

Before RUSSELL and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

WILKINS, Circuit Judge:

George Mebane, Ralph Sears, Larry Woodhouse and Nathan Cartwright, Jr. appeal their convictions for killing game birds while using live birds as decoys in violation of 16 U.S.C.A. § 703 (West 1985) and 50 C.F.R. § 20.21(f) (1986). Defendants contend that the district court erred in interpreting "live birds as decoys" pursuant to the statute and regulation and that the criminal sanctions of the migratory game regulation are unconstitutionally vague. We affirm.

**I.**

Agents of the United States Fish and Wildlife Service instituted an investigation in November 1986 of a waterfowl impound-

---

ment located in Currituck County, North Carolina. The investigation of the impoundment, owned by Mebane and known as Mebane Farms, was initiated after agents noticed an unusual number of ducks at the impoundment during aerial surveillance.

On November 27, 1986, Special Agents Theodore Curtis and Thomas Bennett, accompanied by Woodhouse, inspected Mebane Farms. Woodhouse told the agents that approximately 4,500 ducks had been raised at Mebane Farms in 1985 and 1986. While riding in Woodhouse's truck, Agent Curtis noticed that mallard ducks swimming in an impoundment pond were apparently unaffected by the vehicle's close proximity. At one point during the ride, Woodhouse was forced to stop the truck to avoid hitting ducks walking along the road. Woodhouse stated to Agent Curtis during the ride that a hunting blind on the property was not used to hunt ducks, but only to photograph them.

Following additional aerial surveillance, Agents Curtis and George Hines visited the property on January 9, 1987, concealing themselves at separate locations. The agents observed three hunting blinds that day. Although unable to observe any hunters, they heard sounds of gunfire coming from the southern end of the impoundment, where a fourth blind had been constructed. Agent Curtis noticed that some of the ducks were not frightened by the gunfire and that many of those which flew away returned to the impoundment immediately after the gunfire ceased.

The following day, the two agents met with Cartwright and Sears. Sears told Curtis that the impoundment had not been hunted in three weeks. After Sears contacted Woodhouse by walkie-talkie, Woodhouse explained to the agents that Mebane Farms would not be hunted for the remainder of the year.

The agents conducted additional surveillance of the property on January 14 and 15, 1987. On the first day, Agent Hines observed numerous waterfowl descending to an impoundment pond and feeding frantically just after two unidentified individuals poured a substance into the pond.

Following a morning hunt on the second day during which approximately 19 mallard ducks were killed, Defendants were apprehended. Two of the agents then directed Sears to pole a boat to the area where the hunt had taken place so that an investigation could be conducted. While they were crossing the impoundment waters heading for a dike, 15 to 20 mallard ducks entered the water and swam toward the boat, some coming within 20 to 30 feet. Sears then left the agents to return to the opposite side of the pond. After the agents completed their investigation, Cartwright poled the boat back across the water to retrieve them. This time between 50 to 75 ducks swam within 20 to 30 feet of the boat as Cartwright neared the agents.

The Defendants proceeded to trial before a district judge sitting without a jury. The court acquitted Defendants on charges of taking birds by the aid of bait or over a baited area,[1] but found them guilty of taking birds by the use or aid of live birds as decoys.

## II.

■ Pursuant to the Migratory Bird Treaty Act, 16 U.S.C.A. § 703, it is unlawful "to pursue, hunt, take, capture, kill, attempt to take, capture, or kill ... any migratory bird" except as permitted by regulations promulgated by the Secretary of the Interior. The regulation at issue here, 50 C.F.R. § 20.21, provides, in pertinent part:

> Migratory birds on which open season are prescribed in this part may be taken by any method except those prohibited in this section. No person shall take migratory birds:
>
> .     .     .     .     .
>
> (f) By use or aid of live birds as decoys; although not limited to, it shall be a violation of this paragraph for any person to take migratory waterfowl on an

---

1. This decision appears to be primarily based on the government's inability to identify the substance observed being poured into the impoundment waters.

area where tame or captive live ducks or geese are present unless such birds are and have been for a period of 10 consecutive days prior to such taking, confined within an enclosure which substantially reduces the audibility of their calls and totally conceals such birds from the sight of wild migratory waterfowl.

The government does not contend that Defendants took or attempted to take migratory waterfowl through the use of captive birds, but rather that they utilized tame birds as live decoys.[2] *Cf. United States v. Delahoussaye,* 573 F.2d 910 (5th Cir.1978). Agent Bennett testified concerning the advantages of using live decoys as opposed to artificial ducks. He explained that the movement of the live birds and their grouping together created a more favorable enticement to wild ducks than artificial decoys.

Defendants challenge the sufficiency of the evidence leading to their convictions, asserting that the court erred in its interpretation of the words "live birds as decoys" since the ducks at Mebane Farms were not tame within the meaning of the statute and regulation. In support of this contention, Defendants challenge the observations of the agents and the expert testimony presented on the issue of whether the ducks were tame.

Rather than repeat the testimony previously outlined, it is satisfactory to note that the testimony, when viewed most favorably to the government, was clearly sufficient to support the district judge's finding of guilt. The government's position throughout the trial was that Defendants were raising the ducks on the property to aid in hunting on the property. In support of this position, testimony was produced by the government regarding the effectiveness of tame birds as a lure to wild game.

Expert testimony produced by both the government and Defendants presented conflicting accounts regarding whether the ducks at Mebane Farms were tame for the

purposes of the regulation. Defendants attack the district court's conclusion and argue that the court improperly disregarded the testimony of their expert and agreed with the government's expert. Such credibility determinations were clearly within the responsibility of the trier of fact. The evidence presented by the government clearly supported a finding that Defendants were hunting migratory waterfowl in an impoundment where tame birds in abundance were located.

 Defendants also assert that the criminal sanctions of the migratory game regulation are unconstitutionally vague. We decline to rule on this issue since it was not properly raised before the district court. *United States v. One 1971 Mercedes Benz 2-Door Coupe,* 542 F.2d 912, 915 (4th Cir.1976).

AFFIRMED.

---

**2.** We have located only one other reported prosecution under this portion of the regulation. *Koop v. United States,* 296 F.2d 53 (8th Cir. 1961). In *Koop,* the defendant was acquitted of the charge of attempting to kill wild ducks through the use of tame ducks as decoys. His conviction for hunting in a baited area was affirmed.