935 F.2d 268
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Youseff Mohamed SALEMA, a/k/a Youseff Kyraine, a/k/a James
Joseph Washington, Defendant-Appellant.
 No. 89-5690.
 United States Court of Appeals, Fourth Circuit.
 Argued March 8, 1991.
Decided June 11, 1991.
As Amended June 21, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Herbert F. Murray, Senior District Judge. (CR-88-447)
 John Adrian Gibney, Jr., Shuford, Rubin, Gibney & Dunn, Richmond, Va. (Argued), for appellant; Jane Chittom, Shuford, Rubin, Gibney & Dunn, Richmond, Va. on brief.
 William Warren Hamel, Assistant United States Attorney, Baltimore, Md. (Argued), for appellee; Breckinridge L. Willcox, United States Attorney, Baltimore, Md. on brief.
 D.Md.
 AFFIRMED.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and JANE A. RESTANI, Judge, United States Court of International Trade, sitting by designation.
 PER CURIAM:
 
 
 1
 The evidence at trial established that the appellant, Youseff Mohammed Salema, a/k/a Youseff Kyraine, a/k/a James Joseph Washington entered into a conspiracy with Eraina Stokes and others to commit bank fraud upon Maryland National Bank, and other banks, by executing a complex scheme to deposit and cash bogus checks. More specifically, Salema furnished bogus cashier checks, purportedly drawn upon Guardian Reserve Bank, Ltd., an off-shore bank licensed in Montserrat, to several relatives and friends, who deposited those checks at Maryland National Bank and Signet Bank. After waiting some period of time, each depositor was to withdraw the proceeds of the check, and some wired or sent portions of the proceeds from Maryland to Salema in California.
 
 
 2
 Salema had altered the encoding on each check to cause it to be delayed in the Federal Reserve check clearing system. Although Maryland National Bank believed that it could issue funds against the bogus check because it appeared to be a cashiers check and the check had not been returned, it was in fact only held up in the system. Eventually, the checks were returned as uncollectible, and the bank lost a total of $124,342.91.
 
 
 3
 The evidence showed that in late October of 1988, Salema traveled to Baltimore from California with his girlfriend, Raquel Watts. Upon arrival, the two went to the residence of Eraina Stokes, Salema's sister, where Salema and Stokes entered the bedroom. Although Raquel Watts was unable to hear the conversation in the bedroom, when the two emerged, Stokes had a check. Shortly thereafter, Salema and Watts went to the residence of Stephanie Venable, where Salema gave Venable a check in her kitchen, and assured her in Watts' presence, "Don't worry, the check is real." Next, Salema and Watts visited Watts' mother, Patricia Watts, and Salema gave her a check as well, also assuring her that it was real. Finally, the two stopped at the residence of Anita Ward, Salema's mother, and Salema furnished her with a check also. Salema and Watts then returned to California.
 
 
 4
 The superseding indictment charged Salema with violation of federal law with regard to his actions in concert with Eraina Stokes, and the fraud committed thereby on Maryland National Bank. As to Stokes' check, evidence showed that on October 25, 1988, Stokes opened a savings account at the bank and deposited a single cashiers check in the amount of $50,000. On her savings account application, Stokes stated that she was unemployed. The check Stokes deposited purported to be drawn on Guardian Reserve Bank, Ltd. On November 8, 1988, Stokes and Salema had a telephone conversation in which Salema asked her to send him money. On November 9, Stokes withdrew a total of $45,000 from her savings account at Maryland National Bank. The bogus Guardian Reserve Bank check had not yet been returned, and Maryland National Bank still believed that funds were properly on deposit to cover the withdrawals. Testimony of Steven Smith of Western Union, and documents entered into evidence, established that later in the day on November 9, Stokes wired $5000 to Salema, addressed under the alias Youseff Kyraine. Salema frequently employed "Youseff Kyraine" as an alias. Raquel Watts also testified that Salema received the $5000 from Stokes on that date.
 
 
 5
 Additional evidence fleshed out Salema's plan and scheme to defraud Maryland National. Donald Pelgrim of WFI Corporation testified that Salema met with him on October 28, 1988, in order to arrange the purchase of the license for Guardian Reserve Bank, Ltd., for the price of $35,000. At the time, Guardian had no assets, no business and a zero balance sheet. In addition, Guardian was a "Category B" bank under Montserrat law, a bank that could not issue checks. Then, on November 2, Salema returned to complete the sale, and tendered a $35,000 certified check from Maryland National Bank, drawn on Stephanie Venable's account. In return, Salema received a green binder containing the Guardian license and a number of other corporate papers, as well as the corporate seal. Pelgrim explained to Salema that he was obliged to produce certain documentation as to personal assets, good moral character, criminal record, etc., within thirty days of the transfer, or the license would be revoked and reclaimed. Salema never provided the required documentation to WFI.
 
 
 6
 Guardian was not authorized to do business under the laws of the United States, nor under the law of the state of California.
 
 
 7
 As to the fraudulent cashiers checks themselves, Salema obtained check coding numbers from a blank cashiers check issued by First Federal Savings Bank of California. By altering the code obtained from the First Federal Savings Bank checks, and copying the code onto the bogus checks, Salema was able to ensure that the checks, when deposited, would be held up in the check collection system for weeks, thus creating ample time for Stokes and the other recipients of Guardian checks to withdraw funds in the form of cash or certified checks. The alteration in the check code caused the checks to be sent to the Los Angeles regional check processing center of the Federal Reserve system for collection; but the individual bank code, pertaining to First Federal, rather than Guardian Reserve, prevented collection. All of the checks created by Salema had the same coding on their fronts; all of the checks were numbered "3030." All of the checks bore the same coding, with minor changes, from the First Federal cashiers check.
 
 
 8
 When Salema was arrested in late November by FBI agents in California, a consent search of two briefcases in his possession revealed physical means and tools used in the scheme. A black briefcase contained photocopies of three Guardian checks in blank, with the same coding numbers as the checks employed in the scheme to defraud Maryland National. Also found in the briefcase was a brochure for the British Bank of Hong Kong, bearing the emblem or insignia of the bank with portions whited out. Salema used this altered insignia as the insignia on the bogus Guardian checks. The government also entered into evidence a number of different pieces of identification, including a Kuwait birth certificate bearing the name of Youseff Salema, a Kuwait drivers license bearing Salema's picture and the name of Youseff Kyraine, and a Maryland driver's license bearing Salema's photograph and the name of Youseff Kyraine.
 
 
 9
 FBI agents also searched a brown briefcase in Salema's possession, and its contents were entered into evidence. The briefcase contained the green binder with the Guardian license and various papers pertaining to the corporate structure and Montserrat licensing requirements. Various samples of check paper were inside, as well as more photocopies of the blank bogus Guardian cashier's checks. Two photocopies of a cashier's check from First Federal Savings Bank of California, both numbered "1130" and bearing coding similar to the Guardian checks, with minor alterations, were found in the briefcase. Finally, a form letter to accompany the bogus checks, signed by "Robert Crawford," and another British Bank of Hong Kong logo with extensive white-out alterations, was entered into evidence.
 
 
 10
 Prior to the trial, the government filed a "Motion to Permit Introduction of Evidence," specifically seeking leave of court to introduce evidence of Salema's conduct with Stephanie Venable, Patricia Watts and Anita Ward, the three other recipients of Salema's bogus checks. The court ruled on the motion prior to trial, allowing the admission of such evidence as probative of defendant's "knowledge and intent to defraud the victims of his scheme, as well as his common scheme or plan, that is, his modus operandi."
 
 
 11
 As to Stephanie Venable, the evidence introduced showed that Venable received one check from Salema on the weekend visit in late October. Venable deposited that check, and another bogus Guardian check for $100,000 she had received from Salema, in her account with Maryland National. On November 1, 1990, Venable obtained a certified check from Maryland National in the amount of $35,000, and sent it to Salema in California, where he used it to pay for the purchase of the Guardian Reserve Bank, Ltd. license from WFI Corporation on November 2. Venable obtained a second certified check from Maryland National made out to Youseff Salema in the amount of $10,000 on the same date. Salema apparently endorsed the check.
 
 
 12
 After Maryland National had determined that there was a problem with the Guardian checks, Salema telephoned John Rollinger of Maryland National Bank to assuage that concern. In the course of two telephone calls, Salema suggested that the checks could be processed only by a collection letter, though he could not at the time provide an address for Guardian in California. He then agreed to use faxes to arrange a wire transfer of funds, though he could not give Maryland National a fax number for his bank. A collection letter was eventually sent to the address on the check, but it was returned "addressee unknown." Maryland National never received any funds.
 
 
 13
 Patricia Watts, Raquel Watts' mother, also received a check from Salema in October, made out for $25,000. Salema told her it was a gift at first, though the check was given to her in an envelope with a form letter from Guardian, signed by "Robert Crawford," stating that the money was a loan. The form letter was a copy of the form letter found in Salema's briefcase at his arrest. Watts had not applied for a loan from Guardian, and she told Salema she had no desire for a loan. Salema said that they would discuss it later. Watts was suspicious, so she had the check sent out for collection, and never received any money.
 
 
 14
 Finally, Salema's mother, Anita Ward, received a false Guardian cashier's check for $25,000. After depositing the check in Signet Bank on October 24, Ward withdrew $5000 in cash, and placed $10,000 in a separate money market fund with Signet. On November 7, after Signet had determined that the Guardian cashier's check was fake, Michele Barnes of Signet called Ward at 8:00 a.m., to tell her that Signet would freeze the account. Shortly thereafter, Salema called Barnes and identified himself as Robert Crawford with Guardian Bank. Though he was in Baltimore that morning, he stated he was calling from California. Adopting a Kuwaiti accent, Salema assured Barnes that the Guardian check was good. Though Signet made further attempts to collect on the check by mail, no money was received from Salema or Guardian Reserve Bank.
 
 
 15
 The total amount of bogus checks produced by Salema was $300,000. All of the checks had the same altered coding numbers, the same logo and Guardian Reserve Bank, Ltd., stamp, and each bore the check number "3030." No money was ever collected by Maryland National Bank or Signet on any of Salema's checks.
 
 The Case
 
 16
 The appellant, Youseff Mohammed Salema, was indicted by the grand jury of the District of Maryland on one count each of conspiracy, 18 U.S.C. Sec. 371; bank fraud, 18 U.S.C. Sec. 1344; and interstate transportation of stolen property, 18 U.S.C. Sec. 2314. Each count charged Salema jointly with Eraina Stokes. The conspiracy and bank fraud counts alleged acts done by Salema, Stokes and others known and unknown to the grand jury. The interstate transportation count alleged acts done by Salema and Stokes. Stokes was not tried with Salema and did not testify at his trial. The indictment against her was later dismissed.
 
 
 17
 The case was tried to a jury, which convicted Salema on all three counts. The District Court, Hon. Herbert F. Murray, District Judge, sentenced Salema to thirty-seven months in prison. Salema timely noted this appeal.
 
 I.
 A. Conspiracy
 
 18
 Appellant contends that the evidence at trial was insufficient to support the jury's verdict of guilt as to Count I of the indictment, conspiracy to commit bank fraud. Especially when viewed in a light most favorable to the government and to the jury's guilty verdict, see, e.g., United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir.1989), however, the evidence was sufficient to support the jury verdict. In reviewing the jury's verdict, "[t]he relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt," but rather whether, when the evidence is viewed in a light most favorable to the government, "any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." Id., quoting United States v. MacDougall, 790 F.2d 1135, 1151 (4th Cir.1986).
 
 
 19
 Appellant argues specifically that the evidence failed to prove that Salema made an agreement with any other person to defraud Maryland National Bank, based on the contention that there was no direct evidence of an overt agreement between Salema and Eraina Stokes or anyone else. In essence, appellant claims that at most the evidence establishes that the recipients of Salema's bogus Guardian Reserve Bank checks were "dupes of a single schemer, not his coconspirators."
 
 
 20
 The government need not, however, produce direct evidence of an overt agreement between Eraina Stokes and Salema in order to sustain the jury verdict. United States v. Norris, 749 F.2d 1116, 1121 (4th Cir.1984), cert. denied, 471 U.S. 1065 (1984) (existence of a conspiracy may be provided by circumstantial evidence); see also United States v. Boyer, 84 F.Supp. 905 (E.D.Pa.1949) (a conspiracy is a secret and furtive crime and by its very nature must usually be provided by circumstantial evidence). An agreement may be shown if there is a concert of action, and common purpose and plan may be inferred from a "development and collocation of circumstances." United States v. Glasser, 315 U.S. 60, 80 (1941).
 
 
 21
 The evidence at trial supported the jury's verdict of guilt as to a conspiracy between Salema and Stokes. In late October of 1988, Salema and his girlfriend, Raquel Watts, traveled to Baltimore from California. The two went to Stokes' residence, where Watts saw Salema and Stokes enter the bedroom. When the two emerged from the bedroom, Stokes had a check. On October 25, Stokes opened a savings account at Maryland National Bank and deposited the single cashiers check drawn on Guardian Reserve Bank in the amount of $50,000. On her savings account application, Stokes stated that she was unemployed. On November 9, Stokes withdrew a total of $45,000 from her savings account at Maryland National Bank. The bogus Guardian Bank check had not yet been returned, and Maryland National Bank still believed that funds were properly on deposit to cover the withdrawals. Later that day, Stokes wired $5000 to Salema, addressed under the alias Youseff Kyraine, in California. Raquel Watts also testified that Salema received the $5000 from Stokes on that date.
 
 
 22
 The evidence, though largely circumstantial, is substantial and fully supports the inference and the conclusion that Salema and Stokes entered into a conspiracy to defraud Maryland National Bank, and in fact committed such bank fraud, causing a loss to Maryland National Bank. A rational trier of fact could find Salema guilty beyond a reasonable doubt as to Count I; the jury did so, and its verdict is upheld.
 
 
 23
 B. Interstate Transportation of Stolen Property
 
 
 24
 Appellant raises two issues with regard to his conviction of interstate transportation of stolen property under Count III of the superseding indictment. First, Salema argues that the evidence is insufficient to show that the object transported in interstate commerce, in this case the $5000 wired from Eraina Stokes in Maryland to Salema in California, was in fact stolen property. The evidence as to the conspiracy between Stokes and Salema, however, gives adequate support for the conclusion that the $5000 came directly from the fraudulent Guardian cashiers check deposited at Maryland National Bank. Second, appellant objects to an evidentiary ruling at trial, that is, whether it was proper to refresh Raquel Watts' recollection in the manner allowed.
 
 1. Sufficiency of the Evidence
 
 25
 As with the conviction under the conspiracy count, the jury's verdict cannot be overturned for insufficient evidence where, viewing the evidence in a light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir.1989). Appellant contends that the evidence is insufficient to support the conclusion that the $5000 sent by Stokes to Salema was stolen property.
 
 
 26
 The record, however, fairly supports no other conclusion. Salema gave a bogus $50,000 check to Stokes in late October. On October 25, Stokes opened a new account at Maryland National and deposited only the bogus Guardian check. Two weeks later, after a telephone call from Salema, Stokes withdrew $45,000 from that same account, and that evening, wired the $5000 to Salema, addressed to Salema under an alias. At the time she opened the Maryland National savings account, Stokes claimed that she was unemployed. Stokes' application containing that statement was entered into evidence. The inference is that the money Stokes wired to Salema was withdrawn from her account at Maryland National Bank. Thus, the money itself, as the product of the fraudulent scheme, was stolen property. The jury had enough evidence to conclude beyond a reasonable doubt that Salema had caused the interstate transportation of $5000 obtained by fraud from Maryland National Bank, and obviously did so conclude.
 
 2. The Refreshing of Watts' Recollection
 
 27
 Whether to allow a witness' recollection to be refreshed is an evidentiary decision entrusted to the sound discretion of the trial court. See Bankers Trust Co. v. Publicker Industries, Inc., 641 F.2d 1361, 1363 (2d Cir.1981) (witness' use of the chronology to prompt memory was in the "broad discretion of the trial court to allow").
 
 
 28
 Here, the government used the Western Union record of the transfer of funds from Stokes to Salema to refresh Raquel Watts' recollection of the fact that Salema had called Stokes on the day before the money transfer and asked her to send him money. The only objection made to the use of the money transfer records at the time was that it was not a proper writing or record with which to refresh Watts' memory. The court, in its discretion, allowed the government to proceed. There was nothing to show any abuse of discretion. Even if the method by which the exhibit was used to refresh Watts' recollection was flawed, no objection to foundation or form of the question was raised at the time, and such objection is waived. United States v. Mebane, 839 F.2d 230, 232 (4th Cir.1988).
 
 
 29
 Finally, any abuse of discretion in allowing the government to refresh Watts' recollection is harmless. The wire transfer record itself was entered into evidence. The jury could infer from the mere fact of the delivery of the check to Stokes and the subsequent wire transfer of $5000 from Stokes to Salema--all of which was established by documentary and other evidence--that Salema caused the interstate transport of stolen property.
 
 II.
 
 30
 The appellant next combines two arguments: that the introduction of evidence of other wrongful acts not before the court was error because it was irrelevant and prejudicial; and, that the charge to the jury improperly invited it to use that evidence to show the defendant's character. The first part of the appellant's argument is without merit because the evidence was probative to show his common plan or scheme, and hence was admissible under F.R.Evid. 404(b). However, his second argument, that the jury charge rendered his trial fundamentally unfair, merits more serious consideration.
 
 
 31
 Salema takes exception to the decision of the trial court to admit evidence of his conduct with regard to Stephanie Venable, Anita Ward and Patricia Watts, as evidence of a common plan or scheme, and as evidence showing defendant's knowledge and intent to defraud Maryland National Bank. The trial court's decision to admit that evidence under Rule 404(b) of the Federal Rules of Evidence is a decision entrusted to the sound discretion of the trial court and may be overturned only on a showing of abuse of discretion. United States v. Edwards, 696 F.2d 1277 (5th Cir.), cert. denied, 461 U.S. 909 (1983). Appellant has not shown an abuse of discretion; to the contrary, admission of the evidence as Rule 404(b) evidence was entirely proper.
 
 
 32
 The evidence that the court admitted consisted of two checks made payable to Stephanie Venable (each for $100,000), a check made payable to Patricia Watts ($25,000), and a check made payable to Anita Ward ($25,000). Each bore the Guardian Reserve Bank name, address and logo (altered from the British Bank of Hong Kong logo) on its face and was identical to the check furnished to Eraina Stokes. Each check had altered encoding identical to alterations in the check received by Stokes. Other evidence established Salema's statements to Patricia Watts about her check, and contacts between Salema and Signet bank in which Salema made false statements about his identity, location and the soundness of Guardian Reserve Bank in order to cover and continue his fraudulent scheme. All of this evidence related directly to establishing that the Stokes transaction was part of a common plan or scheme, and that Salema had knowledge of the fraud and the intent to defraud Maryland National Bank.
 
 
 33
 Rule 404(b) of the Federal Rules of Evidence provides that evidence of other crimes, wrongs, or acts is not admissible to prove that a person is of bad character or that a person acted in conformity therewith. Evidence of other wrongful acts is admissible under Rule 404(b), however, if it is relevant to an issue other than character, and is necessary and reliable. See also, United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988); United States v. Greenwood, 796 F.2d 49, 53 (4th Cir.1986). Such evidence is "necessary" if it is an essential part of the charged crime or furnishes part of the context of the crime. Rawle, 845 F.2d at 1247 n. 4 (and cases cited therein).
 
 
 34
 In Rawle, the defendant was charged with conspiracy to possess marijuana and possession of marijuana. The United States introduced evidence that the defendant was involved in an earlier marijuana transportation scheme that was substantially similar to the charged conspiracy. The court held the evidence admissible to show knowledge, common scheme, and plan. Id. Similarly, in United States v. Billups, 692 F.2d 320, 328 (4th Cir.1982), cert. denied, 464 U.S. 820 (1983), the defendant was charged with bribery. The court held that evidence of other bribes (which had been charged in counts of the indictment but dismissed by the trial court) was relevant to show a common plan or scheme.
 
 
 35
 In the instant case, the government's evidence showed a pattern of the defendant furnishing bogus checks, all purportedly drawn on Guardian Reserve Bank, all bearing the same check number and the same altered encoding numbers, to friends and relatives in Baltimore during the same time period, late October 1988. The checks were deposited, funds were promptly withdrawn, and proceeds were wired or sent to Salema. The evidence was thus properly admitted to demonstrate that Salema's transaction with Stokes was part of a fraudulent plan or scheme.
 
 
 36
 On the other hand, on the surface the transcript of the trial court's oral cautionary instruction to the jury on the use of character evidence does seem to present a problem under Rule 404(b). The transcript records the instruction as follows:
 
 
 37
 Finally, ladies and gentlemen, I want to point out that in the course of the government's case there was testimony offered and introduced of other similar transactions which are not charged in the indictment, and I want to give you a cautionary instruction as to how you should consider such evidence. Evidence of other crimes or acts is only to prove, the character of a person in order to show action in conformity therewith. It may be, however, admissible for other purposes, and then there is a listing of such other purposes, and in this case it would be to show intent, planning, knowledge, the absence of mistake or accident. (Emphasis added).
 
 
 38
 The instruction appears to invite the jury impermissibly to consider the evidence of extrinsic acts for an improper purpose. If an objection had been made to the jury charge and overruled, we might have been forced to reverse the conviction. However, it seems entirely probable, in context, that it is the transcript that is in error, for a mistranscription of only one phrase ("only" to "inadmissible") would change the entire meaning. In the absence of an objection or other contextual information that would lead us to believe a reversible error was committed, we will not infer such. The rest of the charge was entirely proper--following up with an instruction as to "admissibility"--and the evidence of Salema's guilt is overwhelming. In the context of this case, we will not reverse because, after the fact, when the opportunity for correction is lost, it is discovered that one word in the transcript appears in error.
 
 III.
 
 39
 Finally, Appellant challenges his sentence of 37 months incarceration as violating the Federal Sentencing Guidelines in effect in 1988. Although findings of fact made by the trial court with respect to other relevant conduct are subject to review under the "clearly erroneous" standard, United States v. Robinson, 904 F.2d 365 (6th Cir.1990), application of the guidelines to those facts is a legal issue, subject to de novo review. United States v. Schaper, 903 F.2d 891 (2d Cir.1990).
 
 
 40
 The trial court accepted the report of the U.S. Probation Office, recommending a 7-level increase from the base level for the value of the fraud. In calculating the total value of the fraud, the court accepted the total amount of the checks produced by Salema in the course of carrying out the fraudulent scheme, with an aggregate face value of $300,000, as constituting relevant conduct to determine the guideline range under Section 1B1.3. The section provides:
 
 
 41
 [The offense level] shall be determined on the basis of ... all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, and occurred during the commission of the offense of conviction, ... [and] all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction ... [and] all harm or risk of harm that resulted from the acts or omissions specified [above]....
 
 
 42
 This Court has held that, in determining the proper guidelines sentence for a conspiracy count, "principles of relevant conduct (Sec. 1B1.3) and U.S.S.G. Secs. 2X1.1 and 2F1.1 should be applied to determine an offense level based on the entire amount of money taken in the fraudulent scheme regardless of whether the money is identified in a count of conviction." United States v. Watford, 894 F.2d 665 (4th Cir.), reh'g & reh'g en banc denied, (1990).
 
 
 43
 The specific offense characteristics under the fraud guideline also support the trial court's sentence. Section 2F1.1(b)(H) requires an increase of 7 levels to the offense level if the loss fell within a range of $200,000 to $500,000. Comment 7 to the guideline states
 
 
 44
 In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss. For example, if the fraud consisted of attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the "loss" would be treated as $40,000 for the purpose of this guideline.
 
 
 45
 United States Sentencing Commission, Guidelines Manual at 2.68 (1988). The evidence at trial demonstrated that the total amount of the fraud undertaken by Salema in pursuing his scheme was $300,000. Under the Guidelines, this larger amount, rather than the amount actually lost or the amount charged in the indictment, is the appropriate amount for determining the offense.
 
 
 46
 Appellant's request for a revision of his sentence to reflect a 3-level reduction for conspiracy under Section 2X1.1(b)(2) is also without merit. First, the proposed reduction was not raised by counsel for Salema in exceptions to the pre-sentence report, or at sentencing. Second, the referenced section provides for such a reduction only if the defendant has not "completed all the acts the conspirators believed necessary on their part for the successful completion of the offense or the circumstances demonstrated that the conspirators were about to complete all such acts but for the apprehension or interruption" of the scheme. United States Sentencing Commission, Guidelines Manual at 2.151 (1988). Again, the evidence at trial was that Salema had completed all acts necessary to commit the intended fraud, and was interrupted only by discovery and apprehension. Thus, appellant's argument for reduction of sentence is without merit.
 
 IV.
 
 47
 Thus, for all of the above reasons, the district court is
 
 
 48
 AFFIRMED.